IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| SCOT SMITH, | ) |
| | ) CASE NO. 3:21-cv-2266-JZ |
| Plaintiff, | ) |
| v. | ) |
| | ) FIRST AMENDED COMPLAINT |
| FIREXO GROUP LIMITED | ) |
| | ) JURY DEMAND ENDORSED |
| | ) HEREON |
| Defendant. | ) |

Plaintiff Scot Smith, by and through counsel, brings this First Amended Complaint and in support thereof states the following:

## INTRODUCTION

1. Plaintiff Scot Smith is an entrepreneur and investor who resides on Kelleys Island, Ohio. In 2019, Scot was introduced to Firexo Group Limited ("FGL"), an England-based private limited company that developed an allegedly innovative consumer fire protection product, Firexo.

2. FGL claimed that Firexo – unlike other consumer fire extinguishers – had the ability to extinguish all types of fires, from kitchen fires to engine fires (which would normally require different types of extinguishers). Moreover, FGL's extinguishers were eco-friendly and backed by a European EN3 accreditation, equivalent to UL certification in the United States.

1

3. Smith invested heavily in the Firexo product, obtaining a majority stake in the company's fledgling U.S. distributor (Firexo, Inc.) as well as nearly 3,000 ordinary shares of FGL stock.

4. In August 2020, about a year after his initial investment in FGL and on the cusp of Firexo's product launch in North America, Smith began to receive reports of extinguishers exploding in the field. Subsequent reports eventually led Smith to order a voluntary recall of Firexo extinguishers in the United States.

5. Months later, Smith learned that FGL had made multiple misrepresentations about Firexo. FGL had, in fact, never applied for or received EN3 accreditation. And FGL's eco-friendly claims have largely disappeared from its website and marketing materials, leading Smith to believe that Firexo is actually no better or worse for the environment than other competing fire extinguishers. At the same time, FGL refuses to provide evidence supporting the claims that it made to Smith in 2019 and 2020 about the Firexo product.

6. For these reasons, Smith brings this action under the securities laws of the State of Ohio and the United States for rescission and damages related to his purchase of FGL stock in 2019 and 2020.

**PARTIES**

7. Scot Smith is an individual residing on Kelleys Island, Ohio.

8. Defendant Firexo Group Limited is a United Kingdom private limited company with headquarters in Amersham, Buckinghamshire, England.

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as Smith and FGL are citizens of different countries and the matter in controversy exceeds $75,000,

exclusive of interests and costs. The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as claims arise under § 10(b) of the Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and Rule 10b-5 promulgated by the SEC hereunder at 17 C.F.R. § 240.10b-5.

10. Personal jurisdiction is proper as FGL caused tortious injury by acts and omissions made both inside and outside the State of Ohio pursuant to R.C. § 2307.382.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and § 27 of the Exchange Act, 15 U.S.C. § 78aa, because Plaintiff's purchase of FGL shares was solicited and procured by FGL in this district and a substantial portion of events giving rise to these claims occurred here.

**FACTUAL BACKGROUND**

12. FGL designs and markets fire extinguishers and sachets that utilize a unique liquid that, supposedly unlike competitor products, works against all classes of fire and is environmentally friendly.

13. On or about March 2019, Smith was introduced to Firexo Group Limited through a commercial consulting firm, Protocol 6 Limited.

14. Smith and FGL, through its CEO Dave Breith, held several discussions about Smith entering into a joint venture with FGL to distribute and market Firexo products in the United States and Canada. These communications took the form of e-mails, phone conversations, in-person meetings, and formal presentations.

15. In these communications, Breith and FGL supported Firexo's distinctiveness by stating that Firexo received EN3 accreditation based on its ability to extinguish all six fire classifications (A through F/K). EN3 is the European equivalent of UL certification in the United States.

16. Specifically, Mr. Smith received FGL's Spring/Summer 2019 investor presentation by e-mail on June 16, 2019 from Mr. Breith. Slide 13 specifically states that the Firexo product is "also accredited with IS09001, ISO14001, ISO 45001, EN3:7:2004, and AI:2007." A timeline included on Slide 26 implies that FGL had secured EN3 accreditation at some point in late 2018 or early 2019.

17. Mr. Breith provided an in-person presentation to Mr. Smith in Port Clinton, Ohio on January 11, 2020. In a section of the accompanying slide deck titled "Legislation, Products & EN3," Mr. Breith wrote that "We have all available certifications in Europe with CNPP, CNPP are probably the largest fire testing centre in Europe, and, used to perform UL tests for them."

18. In an investor update for the fiscal year ending December 31, 2019 sent by Mr. Breith to Mr. Smith on May 29, 2020, Slides 2 and 3 mention delays and inabilities to obtain EN3 accreditation in 2018. However, Slide 3 states that "We are proud to say that all fire testing and accreditations were passed in February [2019]."

19. EN:3 accreditation was of critical importance to Smith, who wanted to ensure that FGL's novel product met European standards before investing considerable capital to develop a market for the product in the United States and Canada, where some jurisdictions and government purchasers would require the product to receive UL certification. EN:3 accreditation signaled to Smith that Firexo was a highly effective and quality product that would achieve regulatory compliance with little issue in the United States and elsewhere in the world.

20. FGL also touted Firexo as an eco-friendly product that is made with natural, water-based, non-toxic, biodegradable ingredients and contained no ozone depleting chemicals. Firexo's eco-friendly characteristics separated it from other competitors in the consumer fire protection marketplace. Specifically:

    a. Slide 16 in FGL's Spring/Summer 2019 investor presentation claims that Firexo is biodegradable, more environmentally friendly, made from natural ingredients, safe to the environment, and non-toxic.

    b. Later, in a July 17, 2019 e-mail to Mr. Smith and others, Mr. Breith repeated and highlighted the representation that Firexo was made from natural ingredients, more environmentally friendly, biodegradable, and non-toxic.

    c. The presentation delivered in person to Mr. Smith by Mr. Breith in Port Clinton, Ohio on January 11, 2020 repeats claims that Firexo was environmentally friendly, non-toxic, and biodegradable.

21. Following several months of face-to-face negotiations in London and correspondence between Ohio and London, Smith and FGL concluded an agreement for a joint venture in the United States. On August 3, 2019, Smith and FGL executed a Shareholder's Agreement whereby Smith pledged to invest GBP 1.7 million in the joint venture in exchange for 70 out of 100 shares of Firexo, Inc., a Florida for-profit corporation. FGL holds the other 30 shares of Firexo, Inc. FGL incorporated Firexo, Inc. in 2018 to serve as a distributor of FGL products in the United States and Canada.

22. In addition to acquiring a majority stake in Firexo, Inc., Smith was also persuaded to invest in FGL itself. From September 2019 to August 2020, Smith purchased 2,964 ordinary shares of FGL at a total cost of USD $587,523.40.

23. Smith purchased FGL's shares based on representations made by Breith and FGL about the Firexo product. To purchase the shares, Smith completed an Application Form for Subscriptions in Sterling and Financial Promotion Certificate. For each share purchase (which

occurred in four tranches in September 2019, twice in July 2020, and in August 2020), Smith wired funds through Key Private Bank in Cleveland to FGL.

24.     Smith assumed management of Firexo, Inc. and began preparations to introduce Firexo to the North American market.  Beginning in August 2020, however, Smith detected significant quality issues with Firexo fire extinguishers.  Sample extinguishers provided to the local fire department on Kelleys Island, Ohio exploded randomly.  A further examination of products in Firexo, Inc.'s U.S. warehouse revealed faulty valves.  After Firexo, Inc. received reports of extinguishers exploding in the field, Firexo, Inc. decided to undergo a voluntary recall at considerable expense to remove a potentially dangerous product from the market and steady Firexo's brand reputation in the United States.

25.     Firexo, Inc.'s recall created a fissure between FGL and Smith.  FGL cautioned against a recall and offered little explanation in terms of a root cause analysis behind the valve failures.  Despite multiple requests for assistance, FGL provided almost no support to Firexo, Inc. during the recall process.

26.     Recently, as part of further meetings to launch Firexo in the North American market, Smith learned that FGL misrepresented its EN3 accreditation and eco-friendly claims. Specifically, Smith learned in a May 2021 FGL group marketing meeting with its two joint venture partners, other distributors, and marketing partners that Firexo was *not* EN3 accredited.  This followed weeks of disregarded requests from Smith and a European joint venture partner for documented proof of Firexo's EN3 accreditation.

27.     Smith knew that FGL had tested the Firexo extinguishers through a third-party laboratory in early 2019, resulting in an initial finding that the extinguishers met EN3 standards for certain categories of fires.  However, a single round of standalone testing is not equivalent to

6

actual accreditation, which FGL claimed in its marketing materials and conversations with Smith in 2019. FGL knew that a single, standalone test was insufficient to support actual accreditation, yet continued to represent in communications and investor materials that Firexo received EN3 accreditation. Smith relied on FGL's representations that it had secured EN-3 accreditation in 2019.

28. Likewise, Smith and other FGL joint venture partners have requested environmental reports and testing from FGL over the last several months in response to FGL deleting and walking back the eco-friendly claims on its website and in other marketing materials. In response, FGL has refused to produce reports justifying its claims. When one European joint venture partner informed FGL that it would conduct independent testing, FGL sent the partner a cease-and-desist letter, arguing that such testing violated the confidentiality provisions of its joint venture agreement.

29. Upon information and belief, Firexo purportedly contains non-natural ingredients, including heightened levels of fluorocarbons. If true, Firexo's chemical composition would be similar to like products on the market, eliminating the distinctiveness that was a major selling point for FGL in its 2019 and 2020 pitch materials.

30. Smith, through counsel, has requested supporting documentation demonstrating FGL's EN3 accreditation and ingredient list to no avail. FGL's misrepresentations have directly and negatively impacted the value of Smith's holdings.

31. Had Smith known at the time of his share purchases that FGL had never applied for nor received EN3 accreditation and had misrepresented the product's environmental characteristics, he would not have purchased FGL stock and would have reconsidered his investments in the joint venture.

## CAUSES OF ACTION

### COUNT ONE: RESCISSION OF FGL STOCK PURCHASES

32. Smith incorporates herein by reference all of the allegations set forth in the paragraphs above.

33. FGL had a duty to accurately disclose to Smith all facts material to his share purchase.

34. FGL knowingly and intentionally misrepresented to Smith that Firexo was EN3 accredited, and that the product was environmentally friendly. FGL knowingly and intentionally failed to inform Smith that Firexo never received EN-3 accreditation, and, to this day, the precise contents of the product are still unknown. As such, Firexo lacks a key feature distinguishing it from other products.

35. Smith reasonably relied upon these misrepresentations in agreeing to purchase FGL stock. Had truthful, complete disclosures been made, Smith would not have invested more than $587,523.40 in FGL stock.

36. As a result of the fraudulent inducement of Smith to purchase FGL stock, he is entitled to an order rescinding his share purchase, and for the disgorgement of more than $587,523.40 paid for the stock.

37. Conditioned upon the relief sought, Smith is ready, willing and able to return the shares of FGL stock he received in consideration for the payment of $587,523.40.

### COUNT TWO: DAMAGES [IN THE ALTERNATIVE TO COUNT ONE]

38. Smith incorporates herein by reference all of the allegations set forth in the paragraphs above.

39. As a proximate result of the misrepresentation by FGL and its omissions in fraudulently inducing Smith to purchase its stock, Smith has been damaged in an amount in excess of $75,000 and is entitled to punitive damages.

**COUNT THREE: RESCISSION BASED UPON FRAUD IN VIOLATION OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934, 15 U.S.C. § 78J(B) AND RULE 10B-5, 17 C.F.R. § 240.10B-5, AND SECTION 17(A) OF THE SECURITIES ACT OF 1933, 15 U.S.C. § 77Q(A)**

40. Smith incorporates herein by reference all of the allegations set forth in the paragraphs above.

41. As of September 1, 2019, FGL had specific and actual knowledge that the Firexo product was not EN-3 accredited and that the product contained chemicals harmful to the environment. FGL knew that a single, standalone EN(3) test did not equate to full product accreditation through an entity like British Standards. Nonetheless, FGL continued to make false representations about Firexo's accreditations.

42. FGL made misrepresentations to Smith across state lines, which caused Smith to transfer more than $587,523.40 across state lines to FGL in England.

43. FGL knowingly and intentionally failed to inform Smith of accurate information, as alleged herein, that was material to his decision to invest $587,523.40 in FGL stock.

44. Therefore, FGL, directly and indirectly, by use of the means and instrumentality of interstate commerce in connection with the Smith's purchase of securities as to FGL knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities.

45. In addition, the Defendant, in the offer or sale of securities to Smith by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operates or would operate as a fraud or deceit upon the purchaser of such securities.

46. By reason of the foregoing, FGL, directly or indirectly, has violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 codified at 17 C.F.R. § 240.10b-5, and Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a).

47. As a proximate result of the violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. § 140.10b-5 and Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), Smith is entitled to an order rescinding his agreements to purchase FGL stock and for an order requiring FGL to disgorge and pay him $587,523.40.

48. Smith hereby tenders and is ready, willing and able to return the shares of FGL stock that he received as consideration for payment of $587,523.40.

### COUNT FOUR: DAMAGES [IN THE ALTERNATIVE TO COUNT THREE]

49. Smith incorporates herein by reference all of the allegations set forth in the paragraphs above.

50. As a proximate result of the violation of Section 10(b) of the Exchange Act, 15U.S.C. § 78j(b), Rule 10b-5 as codified at 17 C.F.R. § 240.10b-5 and Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), by FGL, Smith has been damaged in an amount in excess of $75,000, and is entitled to an award of punitive damages against FGL

## COUNT FIVE: VIOLATION OF O.R.C. § 1701.93 - DAMAGES

51. Smith incorporates herein by reference all of the allegations set forth in the paragraphs above.

52. The misrepresentations by FGL constitute false statements under O.R.C. § 1701.93(A)(1).

53. The misrepresentations were made with the intent to deceive.

54. Smith has suffered actual damages proximately resulting from the false statements made by FGL.

55. Pursuant to O.R.C. § 1701.93(B), FGL is liable for any damages suffered by the Smith as a proximate result of the false statements.

## COUNT SIX: RESCISSION BASED UPON UNLAWFUL SALE OF A SECURITY - O.R.C. § 1707.44 AND § 1707.43

56. Smith incorporates herein by reference all of the allegations set forth in the paragraphs above.

57. The shares of FGL stock issued to Smith pursuant to his purchases constitute a valid security under Ohio law and the sale of FGL stock occurred in the State of Ohio.

58. As more fully set forth above, FGL made material misrepresentations and omissions to Smith that were relevant to a securities transaction and failed to register its securities with the Ohio Division of Securities.

59. The misrepresentations and omissions were presented to Smith in the form of oral and written statements.

60. The misrepresentations and omissions were made with the purpose to deceive.

61. The misrepresentations and omissions pertained to the Firexo products, its alleged quality accreditations, and eco-friendly claims.

11

62. The misrepresentations and omissions were made with knowledge of their falsity.

63. In addition, the sale was made in violation of O.R.C. § 1707.09 by not being qualified in the manner required under Ohio law or otherwise registered under O.R.C. § 1707.06 through § 1707.11, and the securities were not exempt from registration under R.C. 1707.03(X) or any other provisions of Chapter 1707 or Ohio law.

64. By reason of the foregoing, FGL violated O.R.C. §§ 1707.44, including without limitation, sub-parts (B)(1), (B)(4), (B)(6), (C)(1)-(2), (G), (J), (K) and (N), and O.R.C. § 1707.43.

65. Conditioned upon the relief sought, Smith hereby tenders and is ready, willing and able to return the shares of FGL stock he received as consideration for his payment of $587,523.40.

66. As a result of the violations of O.R.C. § 1707.44 and 43, Smith is entitled to an order rescinding his agreement to purchase FGL stock, and for an award of damages against these FGL for $587,523.40, and for all taxable court costs pursuant to O.R.C. § 1707.43(A).

**COUNT SEVEN: DAMAGES [IN THE ALTERNATIVE TO COUNT SIX]**

67. Smith incorporates herein by reference all of the allegations set forth in the paragraphs above.

68. As a proximate result of the misrepresentations of FGL in connection with a securities transaction with Smith as more fully set forth above, Smith has been damaged in an amount equal to $587,523.40.

69. As a result of the violations of O.R.C. § 1707.44, Smith is entitled to an award of all damages and taxable court costs recoverable under O.R.C. § 1707.43(A), against FGL.

WHEREFORE, Plaintiff Scot Smith demands judgment in his favor and against Defendant Firexo Group Limited, for an order rescinding his purchase of Firexo Group Limited shares and

ordering disgorgement of the $587,523.40 that he paid for it, for compensatory damages in an amount in excess of $75,000, for punitive damages, for reimbursement of his attorney fees and the costs of this action, and for such other relief at law or in equity to which he may be entitled.

Dated: March 2, 2022

                                          Respectfully submitted,

                                          */s/ Aaron M. Bernay*
                                          Aaron M. Bernay (0086495*)*
                                          FROST BROWN TODD LLC
                                          3300 Great American Tower
                                          301 East Fourth Street
                                          Cincinnati, OH 45202
                                          (513) 651-6831 (phone)
                                          (513) 651-6981 (fax)
                                          abernay@fbtlaw.com

                                          *Attorney for Plaintiff Scot Smith*

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all matters to which it is entitled.

                                          */s/ Aaron M. Bernay*
                                          Aaron M. Bernay (0086495)

0148075.0746242    4885-5109-7349v3